### TUTTLE v. CLAFLIN et al.

(Circuit Court, S. D. New York. March 15, 1894.)

PATENTS—INFRINGEMENT—ACCOUNTING FOR PROFITS.

Combinations covered by claims of complainant's patent for a frilling and crimping machine were used, with additional features, by defendants, in roller-plaiting machines, producing large quantities of plaitings finished for use as trimmings. On an accounting of profits from the infringement, there was no satisfactory proof that the finished product could be produced by complainant's machines: and it appeared that, while such plaitings could be made by hand, the process was tedious and expensive, and the product inferior and unmerchantable, and they had not been so made before the introduction of the roller-plaiting machines. *Held,* that defendants should not be held liable for profits to the amount of the difference between the cost of making the plaitings by machine and the cost—30 to 50 times greater—of making them by hand; the burden being on complainant to show that the profits were entirely due to his patented combinations, and that the cost price of hand-made plaitings was a fair measure of comparison.

This was a suit by Theodore A. Tuttle, trustee, against John Claflin, executor, and others, for infringement of a patent. The patent was sustained, and held to be infringed, and an accounting ordered. 19 Fed. 599. Defendants filed exceptions to the master's report on the accounting.

Benjamin F. Lee, for complainant.
Edmund Wetmore, for defendants.

COXE, District Judge. This action is based on letters patent No. 37,033, granted to Crosby and Kellogg, December 2, 1862, for an improvement in machines for frilling and crimping. The bill was filed August 1, 1878, 15 years and 8 months after the date of the patent. In March, 1884, the patent was sustained by this court (Tuttle v. Claflin, 19 Fed. 599), and the second and fourth claims were held to be valid and infringed. These claims are as follows:

"(2) In combination, a crimper and a smoother, substantially such as described, and acting, substantially as specified, to hold the crimps to an edge."

"(4) In combination with a crimper substantially such as specified, a spring

acting to force said crimper upon the goods while crimping them and relaxing its pressure while the crimper is retreating, substantially in the manner and for the purpose specified."

The second claim is the broader of the two, the fourth claim being for a more limited combination.

On the 24th of August, 1893, the master filed his report, in which he found no damages against the defendants, but reported the sum of $76,215.85 "as the profits, gains and advantages which the said defendants have derived, received or become entitled to by reason of their infringement." The master proceeded upon the theory that the entire profit of the large roller plating machines used by the defendants was due to the combinations of the claims just quoted, and that the defendants had saved the difference between one-half a cent a yard, the cost when the machines were used, and the cost of making the same number of yards by hand, which was estimated to be 15 cents per yard for linen plaitings and 25 cents per yard for woolen plaitings. In other words, that it cost the defendants $2,419.55 to plait 483,910 yards of goods on the machines; that if they had not used the machines they would have had the same number of yards plaited by hand at a cost of $78,635.40, and that they had, therefore, saved the difference ($76,215.85), and should pay it to the complainant. The comparison was not with the next best trimming, but with the same trimming made in the next best way, or in the way which the master found to be the next best.

On the 26th of August, 1893, the defendants filed exceptions disputing the correctness of all the master's conclusions as to the profits derived by them. The exceptions present several questions of minor importance, the broad, fundamental question being whether the complainant is entitled to recover $76,215.85 as profits from the defendants.

The testimony establishes two propositions—First, the combinations of the second and fourth claims of the Crosby and Kellogg patent would not produce the finished product of the infringing machines used by the defendants; and, second, if machines and products were identical, the comparison instituted by the master between the cost of making the plaitings by defendants' machines and the cost of making them by hand was not, upon the facts of this case, the proper rule of computation.

The invention is an ingenious device, designed originally for a sewing-machine attachment and intended to do the same general character of work as the Arnold ruffler, but it was distinctly an advance over the Arnold machine. It is entirely clear, however, that the mechanisms covered by the second and fourth claims did not and could not produce a commercial plaiting like those made on the defendants' machines, viz. a spaced and ironed wide plaiting ready for use as a trimming for ladies' gowns. The defendants' machines took the frills produced by the combinations of the claims, and by making the plaits uniform and ironing them down originated something which caught the market and produced the demand. In 1867 James Orr, of Glasgow, invented a roller-plaiting machine which seems to have created the demand for trimmings of this kind. At

least there is no satisfactory proof that for six years and more after the Crosby and Kellogg invention their machine, as patented, ever did or ever could make a yard of trimming like that made by the defendants' machines. It was to these machines, organized and perfected long after the Crosby and Kellogg invention, and containing as they did the condensed ingenuity of several prior structures, that the art was indebted for the trimming so fashionable during the period in question. Surely the features added to the machines by Orr, Griffith and Fanning, and particularly the ironing feature by which a perfectly symmetrical finish is imparted to the plaitings, must have contributed something to their value. To assert that the whole value is due to the Crosby and Kellogg invention is erroneous. The complainant is not entitled to appropriate the additional value imparted to the plaitings by those features of the infringing machines not found in the second and fourth claims.

But admitting that the machines used by the defendants were precisely the machines of the claims and nothing more, still the comparison instituted by the master between the cost of plaitings made on them and the cost of hand made plaitings was, it is thought, founded upon mistaken premises. The punishment inflicted upon the defendants is out of all proportion to their fault. They have been adjudged to pay a very large sum of money upon the theory that they have made that sum or saved that sum by the use of the complainant's machine. The proof fails to satisfy the court of the soundness of this view.

Assuming, as we must, that the defendants would have acted in accordance with the ordinary rules which govern human conduct, it is hardly probable that they would have ordered nearly half a million yards of plaiting at such a ruinous cost. Surely there is no presumption that they would have done so. The witness best fitted to speak on this subject, the defendants' superintendent, says that they would not. The presumption was greater that the defendants would have given up the use of this trimming altogether, or would have adopted some substitute, rather than that they would have resorted to a method which common sense would reject both because of its enormous expense and also because of its inefficiency. Not only were plaitings made by hand too expensive, but they were so poorly done that it is doubtful whether the defendants could have used them at any price in competition with the machine-made plaitings. If this were an art in which hand-made plaitings had been used before to any appreciable degree as articles of commerce, and machine-made plaitings had superseded them, there would be more reason for asserting that the defendants would have continued to use the old method if they were prevented from adopting the new. But here there was no old method. The Crosby and Kellogg machine had been in existence for six years and had created no demand for kilt plaitings. Such plaitings could, of course, be made by hand, but the process was tedious and expensive and the product inferior and unmerchantable. It is fair to say that, in a commercial sense, kilt plaitings were not made by hand prior to the introduction of the roller-plaiting machines. The infringing ma-

chines made the demand. They created the market. There is nothing but conjecture to show that the defendants would have resorted to the hand-made method. First, it was so expensive as to be practically prohibitory, and, second, it was impossible to make a marketable plaiting by hand,—one that could compete. successfully with the machine-made plaitings.

But the matter should not be left to presumption. The burden was upon the complainant to establish the affirmative of both these propositions—First, that the profits were entirely due to the combination of the claims; and, second, that the cost price of hand-made plaitings was a fair measure of comparison. He has done neither.

Various illustrations will occur to any one familar with patents where ingenious labor-saving machines have created an art which otherwise would not have existed. Take the paper-bag industry, for instance. Is it a fair assumption that a manufacturer who found himself precluded from using the patented machines, which turn out bags by the thousands, would attempt to supply the market with hand-made bags? A machine will sometimes make in a second an article which never was made before and which can be made by hand only after hours of painstaking toil by a skilled artisan. The machine will supply hundreds of millions of these articles annually to commerce at a price merely nominal. To make the same articles by hand, though physically and experimentally possible, is practically and commercially out of the question. The time, labor and money required would preclude such an attempt. An article costing a dollar cannot compete successfully with a better article costing a mill, and no rational being would attempt such a competition. And yet, if the doctrine of the report is pushed to its logical conclusion, the owners of patents for comparatively unimportant inventions will be able to levy an enormous tribute upon infringers, resulting in fabulous but unmerited wealth to the former and bankruptcy to the latter.

With the highest respect for the opinion of the learned master, the court is unable to agree with the conclusions reached by him.

The exceptions, so far as they relate to the questions discussed, must be sustained.